## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

ROCK HILL MECHANICAL, INC,          )
                                    )
            Plaintiff,              )
                                    )
     vs.                            )          Case No. 4:06CV657 HEA
                                    )
LIEBERT CORPORATION, et al.,        )
                                    )
        Defendants.                 )

## <u>OPINION, MEMORANDUM AND ORDER</u>

This matter is before the Court on Defendants' Motion to Exclude Testimony

of Jack Webster, [Doc. No. 86], Defendant Electronic Support Systems, Inc.'s,

(ESS), Motion for Summary Judgment, [Doc. No. 88], Defendants' Motion for

Summary Judgment, [Doc. No. 90], Plaintiffs' Motion to Strike or in the alternative

Motion in Limine to Exclude Limitation of Liability Provisions of the Warranty,

[Doc. No. 100], Plaintiff's Motion to Exclude Defendants' Expert, Donald Duvall,

[Doc. No. 107]. The responsive parties oppose the respective motions. For the

reasons set forth below, Defendant Electronic Support Systems, Inc.'s Motion for

Summary Judgment, [Doc. No. 88], is denied; Defendants' Motion for Summary

Judgment, [Doc. No. 90], is granted as to Defendant Liebert and denied as to

Defendant ESS; Plaintiffs' Motion to Strike or in the alternative Motion in Limine to

Exclude Limitation of Liability Provisions of the Warranty, [Doc. No. 100], is

denied as moot, Plaintiff's Motion to Exclude Defendants' Expert, Donald Duvall, [Doc. No. 107] and Defendants' Motion to Exclude Testimony of Jack Webster, [Doc. No. 86], are denied as moot.

Plaintiff brought this action against Defendants Liebert Corporation and ESS, Inc. to recover alleged damages for strict liability, strict liability--failure to warn, negligence, breach of express and implied warranties, gross negligence/recklessness/punitive damages, negligent inspection, violation of the Magnuson Moss Act and indemnity.

## Facts and Background

Plaintiff alleges that a Liebert Heat Removal/Environmental Control Unit Mini-Mate 2 ("Mini-Mate 2")[1] was defective and caused water to leak onto MRI controls at Cardinal Glennon Children's Hospital. Plaintiff claims that Liebert and ESS made an express warranty regarding the condition of the Mini-Mate 2 and its humidifier assembly and breached that express warranty.

Plaintiff also brings claims against ESS for "Negligent Inspection." The Second Amended Complaint alleges that "ESS performed a post-installation

---

[1] The Mini-Mate 2 at issue is a model no. MM024E-PHED0, which means that it is a two ton cooling unit with a humidifier. The Mini-Mate 2 is a self-contained unit designed to control temperature and humidity in rooms that house heat-producing electronic equipment.

inspection of the [Mini-Mate 2] to certify its worthiness for operation and use" and that "ESS owed [Plaintiff] a duty to perform said inspection with due care and in a professional, workmanlike manner." Plaintiff further alleges that "ESS breached its duty in failing to perform said inspection with due care and in a professional, workmanlike manner."

In their Answer, Defendants have pled as affirmative defenses, among other things, that "Plaintiff's damages, if any, are contractually limited pursuant to the warranty under which Plaintiff filed this lawsuit."

On October 9, 2001, Plaintiff executed a Subcontract Agreement with J.S. Alberici Construction Co., Inc. "to provide all labor, materials, equipment, and services necessary or incidental to complete the part of the work…set forth in Exhibit A…" for the Cardinal Glennon Children's Hospital Campus Expansion. The total value of the Cardinal Glennon project for Rock Hill was between $4 and $5 million.

Plaintiff's scope of work for the Cardinal Glennon project included furnishing and installing the Mini-Mate 2. Plaintiff holds itself out as experienced professionals in the area of designing and installing HVAC systems. The installation of computer room environmental control units, (CRU's), such as the Mini-Mate 2 falls within the scope of Plaintiff's claims of expertise in HVAC design

and installation. Plaintiff performs only industrial and commercial HVAC work, not residential work.

Pursuant to the Cardinal Glennon Subcontract, it was Plaintiff's responsibility to install the Mini-Mate 2. In performing its work under the Cardinal Glennon Subcontract, Plaintiff was required to comply with industry standards, applicable codes and manufacturer's instructions. Plaintiff was not expecting anyone else to install the Mini-Mate 2.

The Cardinal Glennon project was a design-build project for Plaintiff. A "design-build" project is a project where the owner produces a set of documents or design criteria and Plaintiff produces a fully functional system based on those criteria. The Mini-Mate 2 was selected and installed by Plaintiff as part of its design-build contract with Cardinal Glennon Hospital.

Cardinal Glennon Hospital's MRI patient room E 0104 housed the subject MRI machine and magnet. Adjacent to MRI patient room E 0104 is the MRI controls (or equipment) room, which was designated as Room E 0103. The MRI controls (equipment) room housed GE MRI controls and two Liebert environmental control units, including the Mini-Mate 2 at issue in this case. With respect to the MRI controls (equipment) room and the MRI patient room, Plainitf's responsibility was to provide all labor and material necessary to install the Liebert

equipment, including the Mini-Mate 2. Specifically, Plaintiff was given the heat load requirements for the MRI controls (equipment) room and it was up to it to provide a heat removal and environmental control system that took care of that heat load. Plaintiff was provided a drawing, which showed where the MRI controls would sit within the MRI controls (equipment) room.

On May 29, 2002, Kevin Suiter, as project manager for the Cardinal Glennon project and on behalf of Plaintiff, submitted a purchase order to ESS for one lot of Liebert brand computer room units (CRUs) and requested submittals for approval. ESS provided the requested submittals for the Mini-Mate 2 at issue, pursuant to Plaintiff's request. These submittals complied with specifications required by Plaintiff

The drain cup at issue in this lawsuit sits below the humidifier assembly within the Mini-Mate. The humidifier operates to add water vapor to the room to control humidity. When the Mini-Mate 2 calls for humidification, a fill valve opens, allowing water into the humidifier canister. When the water reaches the electrodes within the canister, current flows and the water begins to warm. As water is boiled off inside the canister, the mineral concentration in the canister increases; however, after a period of time, the mineral concentration becomes too high, causing the water to boil too quickly and the current flow to decrease. When

this happens, the drain valve opens on the bottom of the canister and the water drains into and through the drain cup. The water flows through the drain cup, into the attached piping and eventually into a sewer line. About one gallon of water flushes through the drain cup each time the humidifier canister flushes itself. The canister then fills with fresh water and this "self-cleaning" mechanism or process prolongs the life of the canister.

ESS submitted its invoice for the Mini-Mate 2 at issue on September 17, 2002. Rock Hill issued its check for the purchase of the Mini-Mate 2 on November 15, 2002.

The Mini-Mate 2 was delivered with an Installation, Operation & Maintenance Manual, and a copy of the warranty, start-up papers and an extra wiring diagram. The Mini-Mate 2 Installation, Operation & Maintenance Manual was produced by Rock Hill to Defendants in discovery and it was provided with the purchase of the Mini-Mate 2. If a manual comes with a particular piece of equipment, Rock Hill's project manager Kevin Suiter would expect that Plaintiff would adhere to the instructions and warnings. The Mini-Mate 2 Installation, Operation & Maintenance Manual specifically warns: "CAUTION Units contain water. Water leaks can cause damage to sensitive equipment below. DO NOT MOUNT UNITS OVER SENSITIVE EQUIPMENT. A field supplied pan

with drain must be installed beneath ducted cooling units and water/glycol cooled condensers." Despite Liebert's warning, Plaintiff did not install a field-supplied drain pan underneath the Mini-Mate 2.

Two months after installation of the Mini-Mate 2, MRI controls were installed under the Mini-Mate 2.

The "Checklist for Completed Installation" in the Mini-Mate 2 Installation, Operation & Maintenance Manual specifically requires the installer to check for a "Field provided pan with drain installed under all ducted cooling units and water/glycol condensing units."

The warranty that Plaintiff alleges was provided by Liebert and ESS and breached is the Limited Warranty for Environmental Control Systems Products ("Limited Warranty"). The Limited Warranty "is given ONLY to purchasers who buy for commercial or industrial use in the ordinary course of each purchaser's business." The Mini-Mate 2 was purchased for an industrial or commercial use because it is a commercial grade product. The Mini-Mate 2 is not designed for household use.

The Mini-Mate was ducted over the wall and into the MRI patient room to control the environment in the MRI patient room. As installed, the Mini-Mate was a ducted cooling unit. The Mini-Mate 2 was installed sometime in June 2003.

However, Plaintiff cannot identify any person that was involved with the physical installation of the Mini-Mate 2 from the perspective of hanging it in the ceiling and ducting and piping it. Other than Plaintiff's personnel, there was no one else responsible for or who assisted with the installation of the Mini-Mate 2 in terms of piping, ducting and installing it in the ceiling.

John Good, an employee of ESS, went to Cardinal Glennon on August 7, 2003 to assist with the start-up of the Mini-Mate 2. At the time of the start-up, the Installation, Operation & Maintenance Manual, a copy of the warranty and an extra wiring diagram, which were delivered with the Mini-Mate 2, were still with the unit.

During the start-up, John Good and a service technician of Plaintiff fully tested the Mini-Mate 2. ESS was paid to perform the inspection of the Mini-Mate 2 installation and complete the start-up sheet. Plaintiff cannot identify the Rock Hill service technician that assisted John Good with the start-up.

Gerard Schierman, a service fitter for Plaintiff, has conducted several such start-ups with John Good, which Mr. Schierman says are done to "make sure the piece of equipment is working properly." When John Good does an inspection of an environmental control unit such as a Mini-Mate 2, he is primarily filling out the start-up sheet. As part of filling out the start-up sheet and conducting the inspection

of a Mini-Mate 2 installation, John Good is looking for anything that is going to inhibit the machine from operating in a fashion that causes the temperature and humidity not to be controlled.  John Good's inspection includes running water through the drain cup and visually inspecting it for leaks.  When John Good inspected the Mini-Mate 2 at start-up at Cardinal Glennon, it was operating properly and no leaks were detected.   He does not recall mentioning anything about the lack of a drip pan under the Mini-Mate 2.  Kevin Suiter, the project manager, does not recall John Good being present at the Cardinal Glennon project at any time prior to the start-up of the Mini-Mate 2 on August 7, 2003.          Plaintiff has never had a problem with John Good, and he has always provided very good service – "the kind of support you want."  When John Good comes to assist with a start-up, Plaintiff is not asking for advice on where to install the Mini-Mate 2, because it's already installed when start-up occurs.

Kevin Suiter cannot recall a single conversation he had with anyone at ESS regarding the location of the installation of the Mini-Mate 2.  Nor does Kevin Suiter recall giving ESS a set of drawings or making a set of drawings available for the installation of the Mini-Mate 2, but ESS knew, at the time of its installation, that the room was for MRI controls.

It was a manufacturer's requirement that a field-supplied auxiliary drain pan

be installed under ducted cooling units, such as the Mini-Mate 2 at issue.
If John Good saw a problem, he would mention something to the installer about it.

Schaeffer Electric contracted with General Electric to perform the installation
of the electrical portion of the MRI upgrade, including the installation of the MRI
controls. The MRI controls were installed in the MRI controls (equipment) room
between August 29, 2003 and September 9, 2004, which is between 22 and 33 days
after start-up of the Mini-Mate 2 that was performed in the presence of Mr. Good of
ESS. Prior to August 29, 2003, the MRI controls were not even physically located
in the MRI controls (equipment) room.

Elmer Frederich, Cardinal Glennon's Facilities Manager, testified that he
contacted Plaintiff to inform it of water leaking onto the MRI controls.
He further testified that a serviceman was sent by Plaintiff who "looked into the
possibility of what could've been causing [the leak]." The serviceman thought that
some insulation on the piping might have dripped down, causing the leak and  told
Mr. Frederich that they thought they had resolved the problem. According to Mr.
Frederich's testimony, approximately, one to two weeks later, water leaked onto the
MRI controls again. Again, a serviceman went to Cardinal Glennon to investigate,
and he again opened up the sides and looked at the internal part of the unit. At that
time, it was thought by the serviceman that the internal drain pan possibly could

have been leaking. Rock Hill cannot identify the person or persons that investigated either of the two prior leaks testified to by Mr. Frederich.

Plaintiff never mentioned any concern about the location of the Mini-Mate 2 over the MRI controls or recommended that a drain pan be installed.

On the morning of February 25, 2004, water leaked onto the RF generator of the MRI controls causing it to be damaged. Mr. Frederich contacted Kevin Suiter. Mr. Suiter personally responded to the call from Cardinal Glennon that a leak had occurred.

Gerard Schierman, a Rock Hill service fitter, went to Cardinal Glennon on the day the MRI controls were damaged as a result of the water leak. Mr. Schierman was sent by Rock Hill to find out the origin of the leak, whether the Mini-Mate 2 had leaked and, if so, what to do about it. Due to the fact that there is water within the Mini-Mate 2, it has the potential to leak. For instance, there are many different potential sources for water leaks within the Mini-Mate 2, including contractor connections, the condensing coil , humidifier, a plugged drain, a loose fitting. Because of this potential for water to leak, Liebert recommends that the Mini-Mate 2 not be installed over sensitive electronic equipment and that a field-supplied auxiliary drain pan be installed underneath the Mini-Mate 2.

Mr. Schierman recalls putting his head up into the space to look at the Mini-

Mate 2 on the day of the incident to find out why it had leaked. The side of the unit was not open when he arrived. Mr. Schierman opened the side of the Mini-Mate 2. Mr. Schierman testified that he could not tell where the waster was coming from; he did not know that the cup was broken and that he could not get it to leak. He further testified that when the side is opened, the drain cup was visible to him and that he did not see anything broken. He also testified that he did not see any water. All he could see was moisture where the pieces of the cabinet came together. But it was obvious that a lot of water had dripped out of there, and he thought maybe some construction debris or something had gotten up in the lines or up in the pan from insulation or "that stuff they spray on beams for fire retardant. That gray stuff."

When Mr. Schierman inspected the Mini-Mate 2 and its drain cup on February 25, 2004, he did not see anything broken or leaking, and he could not get the drain cup to leak. Mr. Schierman testified that he did not replace the drain cup and does not know who did.

Kevin Suiter did not identify the drain cup as the source of the leak. Plaintiff has not identified anyone within its corporation who said that the drain cup was the source of the leak. Mr. Suiter does not remember seeing the drain cup before it was removed from the Mini-Mate. Testifying as Plaintiff's corporate representative, Mr. Suiter believes that because Rock Hill purchased a replacement drain cup, Rock Hill

must have replaced the drain cup. However, Kevin Suiter testified that Rock Hill does not know who replaced the drain cup. The replacement drain cup cost $15. Other than the $15 cost of the replacement drain cup, Rock Hill does not know how much additional money it spent to replace the drain cup.

The Limited Warranty provides, in pertinent part:

THIS WARRANTY IS IN LIEU OF AND EXCLUDES ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

USER'S SOLE AND EXCLUSIVE REMEDY IS REPAIR OR REPLACEMENT OF THE LIEBERT PRODUCT AS SET FORTH HEREIN.

IF USER'S REMEDY IS DEEMED TO FAIL OF ITS ESSENTIAL PURPOSE BY A COURT OF COMPETENT JURISDICTION, LIEBERT'S RESPONSIBILITY FOR PROPERTY LOSS OR DAMAGE SHALL NOT EXCEED ON TIMES THE NET PRODUCT PURCHASE PRICE.

IN NO EVENT SHALL LIEBERT ASSUME ANY LIABILITY FOR INDIRECT, SPECIAL, INCIDENTAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES OF ANY KIND WHATSOEVER, INCLUDING WITHOUT LIMITATION LOST PROFITS, BUSINESS INTERRUPTION OR LOSS OF DATA, WHETHER ANY CLAIM IS BASED UPON THEORIES OR CONTRACT, NEGLIGENCE, STRICT LIABILITY, TORT, OR OTHERWISE.

## Standard of Review

The standards for summary judgment are well settled. In determining

whether summary judgment should issue, the Court must view the facts and inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005); *Littrell v. City of Kansas City, Mo.,* 459 F.3d 918, 921 (8th Cir. 2006).  The moving party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Enterprise Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in his pleadings but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists.  Fed.R.Civ.P. 56(e); *Anderson* 477 U.S. at 256;  *Littrell ,* 459 F.3d at 921.  "The party opposing summary judgment may not rest on the allegations in its pleadings; it must 'set forth specific facts showing that there is a genuine issue for trial.'"  *United of Omaha Life Ins. Co. v. Honea,* 458 F.3d 788, 791 (8th Cir.2006) (quoting Fed.R.Civ.P. 56(e)); "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)."  *Hitt v. Harsco Corp.,* 356 F.3d

920, 923 (8th Cir. 2004). An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party" on the question. *Anderson,* 477 U.S. at 248; *Woods,* 409 F.3d at 990. To survive a motion for summary judgment, the "nonmoving party must 'substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy.' *Wilson v. Int'l Bus. Machs. Corp.*, 62 F.3d 237, 241 (8th Cir. 1995)(quotation omitted)." *Putman v. Unity Health System*, 348 F.3d 732, 733-34 (8th Cir. 2003). A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor. *Wilson v. Int'l Bus. Mach. Corp.,* 62 F.3d 237, 241 (8th Cir.1995). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. 242 at 252; *Davidson & Associates v. Jung* 422 F.3d 630, 638 (8th Cir. 2005). Summary Judgment will be granted when, viewing the evidence in the light most favorable to the nonmoving party and giving the nonmoving party the benefit of all reasonable inferences, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Samuels v. Kansas City Mo. Sch. Dist.,* 437 F.3d 797, 801 (8th Cir. 2006). "Mere allegations, unsupported by

specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Thomas v. Corwin,* 483 F.3d 516, 526-7(8th Cir. 2007). "Simply referencing the complaint, or alleging that a fact is otherwise, is insufficient to show there is a genuine issue for trial." *Kountze ex rel. Hitchcock Foundation v. Gaines* 2008 WL 2609197, 3 (8th Cir. 2008).

## Discussion

Initially, Plaintiff concedes that its claim under the Magnuson Moss Act is not viable by reason of the fact that it is not a consumer, as defined and required under the Act. Accordingly, this claim is dismissed.

Defendants move for summary judgment based on the Limited Warranty. Defendants argue that any recovery to which Plaintiff may be entitled is limited by the Limited Warranty which was included in the documentation sent along with the Mini Mate 2. Liebert's Limited Warranty provides, in pertinent part, that "the Liebert product is warranted to be free of defects in material and workmanship for a period of one year. . ." The Limited Warranty sets forth the limitation on Liebert's liability and the buyer's remedies:

> THIS WARRANTY IS IN LIEU OF AND EXCLUDES ALL OTHER
> WARRANTIES, EXPRESS OR IMPLIED, INCLUDING
> MERCHANTABILITY AND FITNESS FOR A PARTICULAR

PURPOSE.

USER'S SOLE AND EXCLUSIVE REMEDY IS REPAIR OR
REPLACEMENT OF THE LIEBERT PRODUCT AS SET FORTH
HEREIN.

IF USER'S REMEDY IS DEEMED TO FAIL OF ITS ESSENTIAL
PURPOSE BY A COURT OF COMPETENT JURISDICTION,
LIEBERT'S RESPONSIBILITY FOR PROPERTY LOSS OR
DAMAGE SHALL NOT EXCEED ON TIMES THE NET PRODUCT
PURCHASE PRICE.

IN NO EVENT SHALL LIEBERT ASSUME ANY LIABILITY FOR
INDIRECT, SPECIAL, INCIDENTAL, EXEMPLARY OR
CONSEQUENTIAL DAMAGES OF ANY KIND WHATSOEVER,
INCLUDING WITHOUT LIMITATION LOST PROFITS, BUSINESS
INTERRUPTION OR LOSS OF DATA, WHETHER
ANY CLAIM IS BASED UPON THEORIES OR CONTRACT,
NEGLIGENCE, STRICT LIABILITY, TORT, OR OTHERWISE.

Pursuant to the terms of the Limited Warranty, performance under the

warranty is governed by the laws of the State of Ohio; none of the parties have

disputed application of Ohio law.  Limitation of warranties is governed by Ohio's

Uniform Commercial Code, R.C. 1302.29 (U.C.C.2-316).  R .C. 1302.29, entitled

"Exclusion or modification of warranties * * * ", which provides in pertinent part:

> (A) Words or conduct relevant to the creation of an express warranty and
> words or conduct tending to negate or limit warranty shall be construed
> wherever reasonable as consistent with each other; but subject to the
> provisions of section 1302.05 of the Revised Code on parol or extrinsic
> evidence, negation or limitation is inoperative to the extent that such
> construction is unreasonable.

(B) Subject to division (C) of this section, to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states for example, that "There are no warranties which extend beyond the description on the face hereof."

Under R.C. 1302.29, it is difficult for a seller of goods to disclaim express warranties because express warranties generally form the basis of the bargain and, therefore, would be unreasonable to disclaim. See *Ohio Sav. Bank v. H.L. Vokes Co.* (1989), 54 Ohio App.3d 68, 72; *Society Nat. Bank v. Pemberton* (1979), 63 Ohio Misc. 26, 29. The Official Comment to R.C. 1302.29 explains the purpose of restricting the disclaimers of express warranties:

This section is designed principally to deal with those frequent clauses in sales contracts which seek to exclude "all warranties, express or implied." It seeks to protect a buyer from unexpected and unbargained language of disclaimer by denying effect to such language when inconsistent with language of express warranty and permitting the exclusion of implied warranties only by conspicuous language or other circumstances which protect the buyer from surprise.

However, reading the plain language of R.C. 1302.29(A), the statute allows an express warranty to be negated or limited, if the disclaimer is not unreasonable.

In the case before the Court, the disclaimer, which limited the warranties, was located among the documentation included with the product. When an individual

reads the documents for the Mini Mate 2, he or she would have been informed that Liebert has only expressly warranted that the Mini Mate 2 would be "free from defects in material and workmanship" and that Liebert disclaimed all other warranties. This is not a case where the buyer needs protection from unbargained and unexpected disclaimers as the Code intended. Instead, Plaintiff is a commercial purchaser and not a purchaser who needs protection from unexpected and unbargained for disclaimers. The present situation appears to be the atypical case in which a seller has effectively limited warranties.

Liebert gave an express warranty; however, the Court finds that Liebert has limited its warranty coverage to "defects in material and workmanship" and has disclaimed all other warranties.

Plaintiff attempts to avoid summary judgment arguing that the limitation was inconspicuous. R.C. 1301.01(J) (U.C.C.1-201) defines conspicuous and provides that a determination of conspicuousness is a matter of law for the Court to decide. Specifically, R.C. 1301.01(J) provides:

> A term or clause is 'conspicuous" when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NONNEGOTIABLE BILL OF LADING) is "conspicuous." Language in the body of a form is "conspicuous" if it is in larger or other contrasting type or color. * * * Whether a term or clause is "conspicuous" is for decision by the court.

Here, Liebert's warranty provided that other than the express warranty that all

merchandise manufactured by Liebert is to be free from defects in material and workmanship. In a separate paragraph, bolded and underlined was the word "Limitations." The words following this caption were in all capital letters. Since the language limiting remedies was in all capital letters, separated from other provisions and set out with a specific heading, the Court finds that Liebert successfully and conspicuously limited the remedies available to Plaintiff with respect to the Mini Mate 2.

Plaintiff also argues that the limitation only limits the claims for breach of warranty. Such a myopic view of the limitation would effectively render the terms of the detailed limitation superfluous; a limitation without a bite. Pursuant to R.C. 1302.29(D) and 1302.93(A)(1) (U.C.C .2-719), the seller may limit the buyer's remedies for breach of warranty to the repair or replacement of the defective product. In addition, liability for consequential damages may be limited or excluded "unless the limitation or exclusion is unconscionable." R.C. 1302.93(C).

"'Repair or replacement' remedies are designed 'to give the seller an opportunity to make the goods conforming while limiting the risks to which he is subject by excluding direct and consequential damages that might otherwise arise.'" *Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co.*, 42 Ohio St .3d 40, 56 (1989). Further, limited remedies generally fail only where the seller is unable or

unwilling to make repairs within a reasonable time.  Id, at 56.

In this case, there is no evidence on which to base a finding that Liebert was unable or unwilling to repair the Mini Mate 2 within a reasonable time. Thus, it would be unreasonable to conclude that the remedy failed of its essential purpose. Accordingly Liebert is entitled to judgment as a matter of law under 1302.29(A). *Norcold, Inc. v. Gateway Supply Co.* 2006 W L 3802609, 8 -13 (Ohio App. 3 Dist.,2006);[2]  *Zaremba v. Marvin Lumber and Cedar Co.,* 458 F.Supp.2d 545, 549 (N.D.Ohio,2006).[3]

While the Court has concluded that Liebert is entitled to summary judgment on Plaintiff's claims, the same cannot be concluded as to Defendant ESS.  The Limited Warranty was sent by *Liebert* along with the Mini Mate 2.  Nothing in the Limited Warranty gives rise to any warranties or limitations on warranties by ESS. ESS presented no such Limited Warranty to Plaintiff and there is no evidence before the Court which would establish that the parties agreed to any limitation. Although Plaintiff alleges strict liability and breach of warranties against ESS as the

---

[2]  Although *Norcold* was an unpublished opinion, the Court finds it persuasive in its discussion of the Ohio Uniform Commercial Code and its application to facts which are strikingly similar to those herein, *vis a vis* the warranty, the limitations thereof and the manner of supplying the warranty and limitations (In *Norcold*, the warranty and limitation was included as a packing slip.)

[3]   Plaintiff contends that the limitation of liability and exclusive remedies cannot absolve Defendants from intentional torts.  Plaintiff, however does not allege any intentional misdoing on the part of Defendants, nor does the record establish any such intentional tortious acts.

designer and manufacturer of the Mini Mate 2, in its response to the Motion for Summary Judgment, Plaintiff urges that ESS is

> not simply an innocent seller in the stream of commerce. Rather, ESS, as the exclusive representative of Defendant Liebert Corporation ("Liebert"), took upon itself the duty to perform installation inspections and was in fact paid for such services.

It appears, therefore, that Plaintiff's claims against ESS are based on its performance of the inspection of the installation of the Mini Mate 2. Genuine issues of material fact remain as to whether ESS owed a duty to Plaintiff, whether, if so, the duty was breached and whether ESS' actions caused plaintiff's damages. As such, ESS is not entitled to judgment as a matter of law.

Likewise, ESS' claim that it is entitled to summary judgment as an innocent seller in the stream of commerce fails, as Plaintiff's Complaint against ESS entails more than the mere allegation that ESS was the seller of the Mini Mate 2.

## Conclusion

Liebert effectively limited its warranties on the Mini Mate 2. Plaintiff has failed to establish that Liebert was unwilling or unable to satisfy the limited warranty with respect to the Mini Mate 2. As such, Liebert is entitled to judgment as matter of law. Defendant ESS is not entitled to judgment as a matter of law, as genuine issues of material fact exist as to its duties to Plaintiff and any alleged breaches thereof.

Because the Court has concluded that Liebert has effectively limited its warranties to Plaintiff, the Motions to Exclude the testimony of experts Webster and Duvall are moot. Likewise, a number of the motions in limine pertain to the issues which have been resolved herein, and are therefore now moot.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion to Exclude Testimony of Jack Webster, [Doc. No. 86], is denied as moot.

**IT IS FURTHER ORDERED** that Defendant Electronic Support Systems, Inc.'s, (ESS), Motion for Summary Judgment, [Doc. No. 88], is denied.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment, [Doc. No. 90], is granted as to Defendant Liebert and denied as to Defendant ESS. A separate judgment as to Defendant Liebert will be entered upon the resolution of the issues remaining herein.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike or in the alternative Motion in Limine to Exclude Limitation of Liability Provisions of the Warranty, [Doc. No. 100], is denied as moot.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Exclude Defendants' Expert, Donald Duvall, [Doc. No. 107], is denied as moot.

**IT IS FURTHER ORDERED** that the parties shall meet and confer prior to

trial on February 1, 2010, with respect to the pending motions in limine.  The parties

shall present to the Court on 9:30 a.m. on February 1, 2010 a status report of which

motions in limine remain pending.

Dated this 29th  day of January, 2010.


_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE